# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No.

GREGORY R. TOPF, Individually and on Behalf of All Others Similarly Situated,

      Plaintiff,

v.

STILLWATER MINING COMPANY,
BRIAN D. SCHWEITZER,
MICHAEL J. MCMULLEN,
GEORGE M. BEE,
PATRICE E. MERRIN,
LAWRENCE PETER O'HAGAN,
MICHAEL S. PARRETT,
GARY A. SUGAR,
THOR US HOLDCO INC., and
THOR MERGCO INC.,

      Defendants.

---

## COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934

---

Plaintiff Gregory R. Topf ("Plaintiff"), by his attorneys, alleges upon information and belief, except for his own acts, which are alleged on knowledge, as follows:

### SUMMARY OF THE ACTION

1.    Plaintiff brings this class action on behalf of the public stockholders of Stillwater Mining Company ("Stillwater" or the "Company") against Stillwater Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated thereunder,

1

arising out of their sale of the Company to Sibanye Gold Limited ("Sibanye"), Thor US Holdco Inc. ("Holdco"), and Thor Mergco Inc. ("Merger Sub") (collectively, "Sibanye").

2.      On December 9, 2016, the Company entered into an agreement and plan of merger (the "Merger Agreement") with Sibanye pursuant to which Sibanye will acquire all outstanding shares of Stillwater with the Company's stockholders receiving $18.00 per share in cash (the "Proposed Transaction").

3.      On January 24, 2017, defendants filed a Preliminary Proxy Statement ("Proxy") with the United States Securities and Exchange Commission ("SEC") in which Stillwater recommended stockholders vote in favor of the Proposed Transaction. The Proxy fails to provide the Company's stockholders with material information and/or provided them with materially misleading information thereby rendering the stockholders unable to make an informed decision as to how to vote at the special stockholder meeting.

4.      Accordingly, Plaintiff seeks to enjoin the Proposed Transaction unless and until the Defendants make corrective disclosures or, alternatively, rescission of the Proposed Transaction in the event defendants are able to consummate it.

## **PARTIES**

5.      Plaintiff is and has been at all relevant times the owner of shares of Stillwater.

6.      Defendant Brian D. Schweitzer ("Schweitzer") was elected to the Board of Directors on May 2, 2013 and became Chairman of the Board on May 17, 2013.

7.      Defendant Michael J. McMullen ("McMullen") has been a director of Stillwater since May 2013, and was appointed President and Chief Executive Officer ("CEO") of the Company on December 3, 2013.

8.      Defendant George M. Bee ("Bee") has been a director of Stillwater since November 2012.

9.      Defendant Patrice E. Merrin ("Merrin") has been a director of Stillwater since May 2013.

10.     Defendant Lawrence Peter O'Hagan ("O'Hagan") has been a director of Stillwater since March 2015.

11.     Defendant Michael S. Parrett ("Parrett") has been a director of Stillwater since May 2009.

12.     Defendant Gary A. Sugar ("Sugar") has been a director of Stillwater since August 2012.

13.     Defendants Schweitzer, McMullen, Bee, Merrin, O'Hagan, Parrett and Sugar are collectively referred to as "Individual Defendants" and/or the "Board."

14.     Defendant Stillwater is a Delaware corporation with its principal executive offices located at 26 W Dry Creek Cir, Littleton, CO 80120. Stillwater's common stock trades on the New York Stock Exchange under the ticker symbol "SWC."

15.     Non-party Sibanye is a South African corporation.

16.     Defendant US Holdco is a Delaware corporation and a wholly-owned subsidiary of Sibanye.

17.     Defendant Merger Sub is a Delaware corporation and a wholly-owned subsidiary of US Holdco

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), as this Complaint alleges violations of Section 14(a) and 20(a) of the Exchange Act.

2.     This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

3.     Venue is proper in this district because: (i) the conduct at issue took place and had an effect in this district; (ii) Stillwater is incorporated in, and maintains its principal place of business in this district; (iii) one or more of the Defendants either resides in or maintains executive offices in this district; (iv) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein occurred in this district; and (iv) Defendants have received substantial compensation in this district by doing business here and engaging in numerous activities that had an effect in this district.

## CLASS ACTION ALLEGATIONS

4.     Plaintiff brings this action on his own behalf and as a class action on behalf of all owners of Stillwater common stock and their successors in interest, except Defendants and their affiliates (the "Class").

5.     This action is properly maintainable as a class action for the following reasons:

(a)     The Class is so numerous that joinder of all members is impracticable.  As of January 24, 2017, Stillwater had approximately 121.2 million shares outstanding.

(b)     Questions of law and fact are common to the Class, including: (i) whether Defendants violated Sections 14(a) and 20(a) of the Exchange Act in connection with the Proposed Transaction; (ii) whether Defendants have failed to engage in a fair process and obtain the best price available for the benefit of Plaintiff and the other members of the Class in connection with the Proposed Transaction; (iii) whether Plaintiff and the other members of the Class were irreparably harmed when the transactions complained of herein were consummated; (iv) whether

Sibanye aided and abetted the Individual Defendants' breaches; and (v) whether the Class is entitled to recessionary damages as a result of defendants' wrongful conduct.

(c)     Plaintiff is committed to prosecuting this action, is an adequate representative of the Class, and has retained competent counsel experienced in litigation of this nature.

(d)     Plaintiff's claims are typical of those of the other members of the Class.

(e)     Plaintiff has no interests that are adverse to the Class.

(f)     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for the party opposing the Class.

(g)     Conflicting adjudications for individual members of the Class might as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

(h)     Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy

## FURTHER SUBSTANTIVE ALLEGATIONS

*Background of the Company*

6.     Stillwater is engaged in the development, extraction, processing, smelting and refining of palladium, platinum and associated metals (PGMs) produced by mining a geological formation in south-central Montana known as the J-M Reef and recycling spent catalytic converters and other industrial sources. PGMs are rare precious metals used in a wide variety of

applications, including automobile catalysts, fuel cells, hydrogen purification, electronic, jewelry, dentistry, medicine and coinage.

7.      The Company is also engaged in expanding its mining development along the J-M Reef and holds exploration-stage properties at the Marathon PGM copper property adjacent to Lake Superior in northern Ontario, Canada and at the Altar copper-gold property in San Juan province, Argentina.

8.      Stillwater is the only U.S. miner of PGMs and the largest primary producer of PGMS outside of South Africa and the Russian Federation.

9.      In 2015, the Company reported $700 million in total revenues, $463.8 million in cash and cash equivalents plus liquid investments, and $26.1 million in underlying earnings attributable to common stockholders.


***The Conflicted Sales Process***

10.      On January 7, 2016, representatives of two financial advisory firms advised the Company's Board of Directors as to their views of Stillwater's potential strategic alternatives in light of difficult industry conditions the Company was experiencing. President and CEO McMullen informed the board of an inquiry he received from the CEO of a substantial industry participant, referred to in the Proxy as "Company A", as to whether Stillwater would be interested in exploring a merger of equals transaction involving Company A and Stillwater.

11.      The sales process was initiated on January 30, 2016, when McMullen was contacted by a representative of a financial advisory firm and agreed to meet with Neal Froneman ("Froneman"), the CEO of Sibanye, at an industry conference on March 1, 2016.

12.     During February 2016, representatives of Company A and Stillwater continued preliminary discussions regarding a possible merger of equal transaction, and Company A performed additional work, including conducting site visits at Stillwater's operations in late February 2016.

13.     On March 1, 2016, McMullen and Christopher Bateman ("Bateman"), the Company's chief financial officer ("CFO") met with Froneman and James Wellstead ("Wellstead"), a senior vice president of Sibanye. After the meeting, Froneman inquired as to whether Stillwater would be interested in a strategic transaction and requested guidance as to the type of transaction that Stillwater might consider.

14.     On March 8, 2016, McMullen responded to Froneman's inquiry, stating that Stillwater would be open to any option that would be reasonably expected to maximize shareholder value, and noted that management believed that it was likely that a majority of Stillwater's shareholders would prefer a transaction involving a substantial cash component at a premium to market sufficient to compensate them for potential loss of equity.

15.     From March through June 2016, Stillwater continued to progress discussions with both Company A and Sibanye, and also pursued other possible strategic alternatives, including acquisitions by Stillwater. The Proxy indicates that trading prices for Stillwater common shares had increased during the period from January 2016 through June 2016, but it did not specify the value of that increase.

16.     In July 2016, the CEO of Company A informed McMullen that Company A's board of directors was not supportive of Company A pursuing a transaction with Stillwater because the two companies were primarily focused on mining different precious metals.

17.     On July 21, 2016, Sibanye submitted a preliminary non-binding indication of interest to acquire Stillwater at a price of $15.75 per share in cash.

18.     After meeting on July 27 and 28, 2016, the Company's Board of Directors authorized management to enter into a customary confidentiality agreement with Sibanye, and directed management to consider other parties that would be reasonably expected to be interested in a strategic transaction with the Company.

19.     On August 9, 2016, Stillwater and Sibanye entered into a confidentiality agreement, and thereafter Stillwater provided Sibanye and its representatives with access to non-public information.

20.     On August 10, 2016, Stillwater's board of directors discussed other potential interested parties, all of which were mining companies, and then contacted 15 of these companies. Two of these companies, referred to in the Proxy as "Company B" and "Company C," later signed confidentiality agreements and were provided access to non-public information. Stillwater also again contacted Company A to inquire whether Company A had potential interest in a transaction with Stillwater despite having indicated in July that it would not proceed. Company A again indicated that it would not proceed, and declined to sign a confidentiality agreement.

21.     From mid-August through September 2016, representatives of Stillwater had discussions with, and provided non-public information to, Company B, Company C, and Sibanye. Company B conducted site visits to Stillwater's operations in late September 2016, and Company C conducted site visits to Stillwater's operations in early October 2016.

22.     During meetings on October 26 and 27, 2016, Stillwater's Board of Directors decided to retain an independent financial advisory firm and another law firm, in addition to Stillwater's regular corporate counsel, to assist the board in the strategic assessment process.

23.     After telephonic interviews of four potential advisory firms, followed by meetings with two of the firms, conducted by an ad hoc board committee, the Board authorized the retention of Bank of America Merrill Lynch ("Merrill Lynch") at a meeting on November 7, 2016. At that same meeting, the board also authorized an ad hoc committee of directors to oversee the retention of additional legal counsel. Following interviews, the ad hoc committee recommended, and the board approved the retention of, Jones Day. Although Merrill Lynch and Jones Day were retained by the company, they were selected by and reported to the Stillwater Board of Directors.

24.     On October 29, 2016, a representative from Sibanye informed McMullen that Sibanye was hoping to complete due diligence and announce a transaction by no later than November 21, 2016. McMullen informed Sibanye that he did not believe that this timetable was achievable but that Stillwater remained willing to continue discussing a possible strategic transaction.

25.     During the following week, Merrill Lynch contacted 8 additional counterparties to a strategic transaction, of which only one party was interested, referred to in the Proxy as "Company D." The Proxy indicates that Company D signed a confidentiality agreement, but does not state whether the agreement contained standstill provisions.

26.     On November 9, 2016, representatives of Sibanye contacted McMullen and Bateman by telephone and indicated that Sibanye aimed to submit a revised indication of interest by the end of November 2016.

27.     On November 14, 2016, Sibanye's counsel, Linklaters LLP ("Linklaters"), delivered a draft merger agreement to Jones Day.

28.     On November 17, 2016, Company C informed a representative of Merrill Lynch that it had decided not to make a proposal and was withdrawing from the strategic assessment

process. On that same day, Jones Day contacted Linklaters to discuss key issues in the merger agreement, including the conditions to closing and termination and break-up fee provisions. On the following day, Jones Day sent a mark-up of the draft merger agreement to Linklaters.

29.    On November 19, 2016, representatives of Sibanye informed McMullen and Bateman that Sibanye needed approximately two weeks to complete due diligence and arrange committed financing, and if a transaction could not be announced by the second week in December, Sibanye would likely be required to delay proceeding with a possible transaction until after the end of the year. So, the representatives of Sibanye proposed a December 5, 2016 completion date if the parties were able to reach agreement to proceed with a transaction.

30.    On November 20, 2016, Company A informed McMullen that it was not interested in any possible transaction in which Stillwater would be acquired at a premium to market. Company A's CFO indicated that it was possible that Company A would later consider a merger-of-equals transaction, but only if Stillwater proposed such a transaction, given the reluctance of Company A's Board of Directors to consider a transaction earlier in 2016 and their refusal sign a confidentiality agreement.

31.    On November 22, 2016, representatives of Stillwater informed Sibanye that, to be seriously considered, Sibanye would need to substantially increase its offer price from the $15.75 per share price it had indicated in July 2016. Later on that day, Froneman confirmed with McMullen that Sibanye understood that it would need to increase its offer price for a transaction with Sibanye to be seriously considered.

32.    At the Stillwater Board of Directors meeting on November 23, 2016, representatives of Merrill Lynch reviewed with the Board the status of the third-party outreach effort, including that (1) Sibanye continued to appear interested but had not at that time indicated

an increased price, (2) Company A had declined to sign a confidentiality agreement or participate in the process generally, (3) Company B had not responded to Merrill Lynch's outreach efforts, and (4) Companies C and D had informed Merrill Lynch that they were withdrawing from the process. In addition, representatives of Merrill Lynch informed the Board that, as the Board had directed, they contacted two additional mining industry participants that had been contacted by Stillwater management earlier in 2016, referred to in the Proxy as "Company E" and "Company F," to again assess their interest in a potential strategic transaction. Company E indicated that it might be interested in a possible stock-for-stock merger of equals transaction, and Company F had not responded as of the time of the board meeting.

33.     Also on November 23, 2016, Stillwater's Board of Directors directed Merrill Lynch to extend the previous deadline for an indication of interest from Company B from November 23 to November 28th, given that Company B had done substantial work including site visits earlier in 2016. With respect to Company A, the Board recognized that it was unlikely that a merger of equals transaction would result in a more favorable transaction to shareholders than a sale transaction at a premium due to the absence of substantial cost-saving synergies in any reasonably likely transaction. Nonetheless, the Board directed Merrill Lynch to provide an overview of this potential alternative to the Board at a future meeting. Finally, at the direction of the Board, Merrill Lynch granted Company B an extension to submit a proposal until November 28, 2016, but Company B did not submit a proposal by that date or otherwise respond to efforts by Stillwater's representatives to engage.

34.     On December 1, 2016, after Stillwater, Sibanye and their respective legal and financial advisors met to discuss the possible transaction, a representative of Sibanye informed

Stillwater that Sibanye would be willing to increase its price to acquire Stillwater from $15.75 per share in cash to a range of $17.50 to $17.75 per share in cash.

35.    On December 2, 2016, during a meeting among Stillwater's Board, management, and legal and financial advisors, it was the consensus of the board that Stillwater should obtain an increase in Sibanye's proposed price of $17.50 to $17.75 per share. The Board then reviewed management's projections as well as Merrill Lynch's preliminary financial analyses based on the then-current trading price of the Stillwater common shares and management's projections. These preliminary financial analyses were prepared prior to Sibanye informing Stillwater of the increase to its proposed price and were therefore based on the original $15.75 price. Merrill Lynch also reviewed with the board the relative contributions of Stillwater and each of Company A and Company E, and reviewed a high-level financial overview of merger of equals transactions. The Board considered that there would not be substantial synergies generated by a merger of Stillwater with any other mining company and determined that if there was a disparity in the trading multiples of the parties to a stock-for-stock merger, the most likely outcome would be a blended multiple, that multiple compression would be as likely as multiple expansion, and that it therefore would be imprudent to proceed with a merger of equals transaction. Based on this discussion, it was the consensus of the Board that a merger of equals was not a better strategic alternative than a sale transaction, and that if a transaction with Sibanye or Company F were determined to be the best strategic alternative, delaying pursuit in an effort to determine the possibility of a transaction with Company A or Company E risked losing a superior opportunity.

36.    Later on December 2, 2016, Stillwater notified Sibanye that its Board rejected Sibanye's share proposal. On the following day, Sibanye indicated that it was willing to increase its proposed price to $18.00 per share in cash. On December 4, 2016, in response to requests from

McMullen that it further increase its indicated price, Sibanye informed Stillwater that $18.00 per share was its final and best price.

37.     At a Board meeting on December 4, it was the consensus that management and advisors should endeavor to continue to progress discussions with Sibanye, as well as to determine whether or not Company F was interested in pursuing a transaction involving Stillwater.

38.     Between December 4 and December 8, 2016, representatives of Jones Day and Linklaters substantially concluded negotiation of definitive merger documentation, and on December 8, Froneman informed McMullen that Sibanye's Board of Directors had approved the acquisition of Stillwater at $18.00 per share in cash, and that Sibanye's two largest shareholders had indicated their support for the proposed transaction.

39.     On the evening of December 8, 2016, McMullen reported that Company F, the only party other than Sibanye continuing in the process, had not submitted a proposal and had withdrawn from the process. Representatives of Jones Day then reviewed the material terms of the draft merger agreement, after which representatives of Jones Day of Merrill Lynch reviewed with the Board information regarding material investment and corporate banking relationships between Merrill Lynch and its affiliates and Sibanye, noting that Merrill Lynch (including certain personnel who were consulted on specific matters relating to Sibanye's capital raising abilities by member of the Merrill Lynch team working with Stillwater) had provided investment and corporate banking services to Sibanye over the prior two-year period. Also at this meeting, Merrill Lynch reviewed with the Board its financial analysis of the proposed per share consideration and delivered an oral and written opinion to Stillwater's Board to the effect that the per share consideration to be received in the merger was fair, from a financial point of view, to the shareholders. Thereafter, Stillwater's Board of Directors unanimously determined that the merger and the transactions

contemplated by the merger agreement were fair and in the best interests of Stillwater and its shareholders, approved the merger agreement and the merger, resolved to recommend that Stillwater's shareholders adopt the merger agreement and directed that the merger agreement be submitted to Stillwater's shareholders for adoption at a duly convened meeting.

40.      On December 9, 2016, Stillwater and Sibanye signed the merger agreement and publicly announced the transaction prior to the opening of trading on the JSE and NYSE on that date.

***The Materially Incomplete Proxy Statement***

41.      On January 24, 2017, Stillwater filed the Proxy with the SEC in which the Stillwater Board recommended that stockholders vote in favor of the Proposed Transaction.  The Proxy fails to provide the Company's stockholders with material information and/or provided them with materially misleading information thereby rendering the stockholders unable to make an informed decision as to how to vote at the special shareholder meeting.

42.      The Company failed to disclose material facts related to the confidentiality agreement with other industry participants. For instance, the Proxy indicates that Company B, Company C, and Company D signed confidentiality agreements, but fails to disclose whether the agreement contained standstill provisions, and if they did contain standstill provisions, whether those provisions would prevent them from submitting an acquisition proposal.

43.      With respect to management's projections, the Proxy fails to disclose the following information: (i) revenue; (ii) stock-based compensation; and (iii) reconciliation of generally accepted accounting principles ("GAAP") net income to non-GAAP earnings before interest expenses, taxes, depreciation, and amortization ("EBITDA"), non-GAAP unlevered free cash flow, and the non-GAAP measure of "cash flow" used to calculate pricing multiples in Merrill

Lynch's *Selected Publicly Traded Companies Analysis* and its *Selected Precedent Transactions Analysis*. Beyond the fact that information concerning a company's projections is always material to a shareholder who is being cashed out of his stockholdings, this information is also material because Merrill Lynch utilized this information in performing their Net Asset Value ("NAV") analysis, (page 41).

44.     With respect to Merrill Lynch's NAV analysis, the Proxy fails to disclose estimated mine closure abilities, and explain the basis therefore. Additionally, the Proxy fails to quantify the "value of Altar Resources," and to release to stockholders the *Preliminary Economic Assessment* that forms the basis therefore.

45.     Without the omitted information identified above, Stillwater's shareholders are missing critical information necessary to evaluate whether the proposed consideration truly maximizes shareholder value and serves their interests. Moreover, without the key financial information and related disclosures, Stillwater's public shareholders cannot gauge the reliability of the financial advisor's fairness opinions and trust the Board's recommendation to vote in favor of the Proposed Transaction.

## CLAIMS FOR RELIEF

### COUNT I

**On Behalf of Plaintiff and the Class Against All Defendants for Violations of
Section 14(a) of the Exchange Act and Rule 14a-9**

46.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

47.     Defendants have filed the Proxy Statement with the SEC with the intention of soliciting Stillwater stockholder support for the Proposed Transaction.  Each of the Individual

Defendants reviewed and authorized the dissemination of the Proxy Statement, which fails to provide the material information referenced above.

48.     In so doing, Defendants made materially incomplete and misleading statements and/or omitted material information necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors of Stillwater, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).

49.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with stockholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

50.     Specifically, and as detailed above, the Proxy Statement violates Section 14(a) and Rule 14a-9 because it omits material facts concerning the value of Stillwater's shares and the financial analyses performed by Union Square in support of its fairness opinion.

51.     Moreover, in the exercise of reasonable care, the Individual Defendants knew or should have known that the Proxy Statement is materially misleading and omits material information that is necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.  The Individual Defendants knew or should have known that the material information identified above has been omitted from the Proxy Statement, rendering the sections of the Proxy Statement identified above to be materially incomplete and misleading.

16

52.     The misrepresentations and omissions in the Proxy Statement are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction. Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**On Behalf of Plaintiff and the Class against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

53.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

54.     The Individual Defendants acted as controlling persons of Stillwater within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Stillwater and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

55.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to the time the Proxy Statement was filed with the SEC and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

56.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The omitted information identified above was reviewed by the Board prior to voting on the Proposed Transaction.  The Proxy Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of the Proxy Statement.

57.     In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

58.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

59.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

60.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands injunctive relief in his favor and in favor of the Class and against the Defendants jointly and severally, as follows:

A.      Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.      Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the Proxy Statement;

C.      Directing the Defendants to account to Plaintiff and the Class for all damages suffered as a result of their wrongdoing;

D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.      Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATE: January 31, 2017                    Respectfully submitted,

                                          */s/ Rusty E. Glenn*
                                          Rusty E. Glenn
                                          **THE SHUMAN LAW FIRM**
                                          600 17th Street, Suite 2800 South
                                          Denver, CO 80202
                                          Telephone: (303) 861-3003
                                          Facsimile: (303) 536-7849
                                          Email: rusty@shumanlawfirm.com

                                          Kip B. Shuman

19

**THE SHUMAN LAW FIRM**
Post-Montgomery Ctr.
One Montgomery Street, Ste. 1800
San Francisco, CA 94104
Telephone: (303) 861-3003
Facsimile: (303) 536-7849
Email: kip@shumanlawfirm.com

*Local Counsel for Plaintiff*

**LEVI & KORSINSKY, LLP**
Shane T. Rowley
Ashling M. Soares
733 Summer Street, Suite 304
Stamford, CT 06901
Tel: (212) 363-7500

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF

I, Gregory Roland Topf ("Plaintiff"), declare, as to the claims asserted under the federal securities laws, that:

1.  Plaintiff has reviewed a draft complaint against Stillwater Mining Company ("Stillwater") and its board of directors and has authorized the filing of a complaint substantially similar to the one I reviewed.

2.  Plaintiff selects Levi & Korsinsky LLP and any firm with which it affiliates for the purpose of prosecuting this action as my counsel for purposes of prosecuting our claim against defendants.

3.  Plaintiff did not purchase the security that is the subject of the complaint at the direction of Plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

4.  Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

5.  Plaintiff's transactions in Stillwater securities that are the subject of the complaint during the class period specified in the complaint are set forth in the chart attached hereto.

6.  In the past three years, Plaintiff has not sought to serve nor has served as a representative party on behalf of a class in an action filed under the federal securities laws.

7.  Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing information is correct to the best of my knowledge.

Signed this 31st day of January, 2017.

Gregory Roland Topf

| Transaction (Purchase or Sale) | Trade Date | Price Per Share | Quantity |
|---|---|---|---|
| Purchase | 5/3/12 | $10.13 | 250 |
| Purchase | 12/7/10 | $20.62 | 250 |
| Purchase | 11/29/10 | $18.64 | 500 |